761 F.2d 1459
 18 Fed. R. Evid. Serv. 330
 UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald WATCHMAKER, a/k/a "Arab"; Christopher Keating, a/k/a
"Louie the Lip"; Eugene Michael Marcaccio, Jr., a/k/a "Mad
Mike"; Wilson Tony Harrell, a/k/a "Roadblock", a/k/a "RB";
Roger White, a/k/a "Mighty Mite"; Harry Ruby, a/k/a
"Harpo"; Kenneth Hart, Charles Gibson, Scott Seaver, a/k/a
"Buzzard"; Edward L. Lackey; Charles E. Graves, a/k/a
"Vulcher", a/k/a "Vulture", Defendants-Appellants.
 No. 83-3425.
 United States Court of Appeals,
Eleventh Circuit.
 May 30, 1985.
 
 David R. Fletcher, Jacksonville, Fla., for Watchmaker.
 Bruce J. Greenspan, Jacksonville, Fla., for Keating.
 Randall J. Silverberg, Jacksonville, Fla., for Marcaccio.
 Robert Stuart Willis, Jacksonville, Fla., for Harrell.
 Robert B. Persons, Jr., Jacksonville, Fla., for White.
 Ralph J. Humphries, Jacksonville, Fla., for Ruby.
 John P. Stone, Jr., Jacksonville, Fla., for Hart.
 Hugh Cotney, Jacksonville, Fla., for Gibson.
 Brent D. Shore, Jacksonville, Fla., for Seaver.
 Eugene F. Murphy, Jacksonville, Fla., for Lackey.
 Jack M. Schemer, Jacksonville, Fla., for Graves.
 John E. Steele, Asst. U.S. Atty., Jacksonville, Fla., Lee Wm. Atkinson, Tampa, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Florida.
 Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 On October 6, 1982, a federal grand jury returned an indictment against 16 "patchwearing" and probate members of the Outlaw Motorcycle Club. Charges were brought under provisions of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C.A. Sec. 1962(c) and (d), alleging substantive violation of and conspiracy to violate the statute. Fourteen of these defendants were tried before a jury between February 8, 1983, and March 29, 1983. On April 1, 1983, the jury returned its verdicts, finding 13 of the 14 defendants guilty as charged. One defendant was acquitted of both the substantive and the conspiracy charges. Sentencing took place on July 1, 1983, and individualized sentences of eight to forty years were imposed. Eleven of the 13 defendants thus convicted are joined in this appeal.
 
 I. The Facts
 
 2
 Testimony at the trial revealed that the Outlaws, an enterprise with chapters throughout the Southeast, conducted its affairs through the sale of drugs and the organization of prostitution rings. The Tampa and Jacksonville chapters, of which appellants were members, were connected in particular with the sale of marijuana, cocaine, and quaaludes and with a prostitution ring in Meridian, Mississippi. The prostitutes, or "old ladies," of the Outlaws were among the key witnesses at the trial. These women, who were bought and sold among the members of the Club (which received the proceeds from their activities), testified concerning their prostitution and their relationship with the Outlaws. The prostitutes also testified to the drug-selling ventures of the Outlaws, as did several former Outlaws who were no longer members of the Club, and a number of government investigators. Additional evidence was acquired by means of electronic surveillance, some of it conducted pursuant to state drug enforcement efforts. Among the predicate offenses with which appellants were charged were: the shooting of three policemen at the Tampa Clubhouse, the murder of one Ricky Jones, the extortion of Nora Henson and Susan Beckworth (two "old ladies" of the Club), the organization and maintenance of the Meridian prostitution ring, and the conduct of drug traffic in Oklahoma City and Jacksonville. Other relevant facts will be presented in connection with those claims to which they apply.[1]
 
 
 3
 II. District Court's Conference with Juror Merkison
 
 
 4
 On March 30, 1983, one day after the jury began its deliberations, the jury sent a note to the court asking if it could have "a private discussion with you based solely on the fact of jurors' participation," or if one juror could "request a private discussion with you based on his or her need to be dismissed." The court called the jury to the courtroom to find out if the juror in question had "a private medical problem which the juror may be embarrassed to announce in front of everyone," or if it "has something to do ... a failure to cooperate." On learning that the basis of the problem was not medical, the court stated that it could not meet with the juror in private and sent the jury back to its deliberations. Early on March 31, 1983, the court revealed that Juror Merkison had requested a private meeting with the court "because of personal reasons for being excused from jury duty." The court asked the foreman of the jury whether the problems were being worked out and deliberations could continue; the foreman replied that "things have gone a lot smoother today, this morning, than they have in the past two days." The court then asked whether any juror desired to meet with him privately. Juror Merkison raised her hand. Over the objections of appellants' counsel, the court asked the jury to cease its deliberations and subsequently met with Juror Merkison in his chambers. A transcript of the conversation was prepared and was distributed to all parties after the meeting.[2]
 
 
 5
 During this meeting Juror Merkison expressed her fear of retaliation on the part of appellants or other Outlaws and referred anecdotally to the way this fear had affected others. (She stated that "Gloria, she changed--with this grand jury, she's changed her phone number and she's not even living at her house, she's in fear" and added that "the guy mentioned yesterday he allows no one--he requested no one pick his kid up from school ..."). The court emphasized the responsibility that had been placed in the jury and the need for Juror Merkison to return to deliberations and to attempt, with the others, to reach a verdict. After the meeting Juror Merkison returned to the jury, which reached a verdict on April 1, 1983. Appellants object to the meeting on three grounds: 1) the court's entreaty to return to deliberations and reach a verdict was tantamount to a supplemental Allen charge instructing the jury that it was obliged to reach a verdict; 2) the court erred in not holding a hearing on the possibility of juror bias when it learned from Juror Merkison that jurors had spoken of their fear of retaliation; and 3) the exclusion of appellants and their counsel from the meeting violated their constitutional right to be present at all trial proceedings.
 
 
 6
 Appellants' first claim has little merit. This Circuit has declined to reject the Allen instruction. See United States v. Bailey, 468 F.2d 652 (5th Cir.1972), aff'd en banc, 480 F.2d 518 (1973). More importantly, the record is replete with indications that the court had no intention, nor did its moderate words create the effect, of administering an Allen instruction. First, the setting was not one in which the court sought to "dynamite" a stubborn or stymied jury, but one in which the court sought to provide guidance to an individual juror with personal problems. Second, the court's entreaty to Juror Merkison to "render a fair verdict, whatever that might be" or "go back in there and work with those other eleven people and try to render a verdict" did not approach the force of the language condemned in United States v. Jenkins, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), which instructed jurors that "[y]ou have got to reach a decision in this case." 380 U.S. at 446, 85 S.Ct. at 1060. Finally, the court's advice to Juror Merkison did not contain any of the elements of the Allen instruction held to be most troublesome: the suggestions that a juror should not trust her own opinions in deliberation or that a member of the jury who found herself in the minority should reexamine her position. United States v. Bailey, supra.
 
 
 7
 Appellants' second argument is no more compelling than the first. Not only is the procedure to be used in investigating alleged juror misconduct within the discretion of the trial court, United States v. Yonn, 702 F.2d 1341 (11th Cir.), cert. denied, sub nom. Weeks v. United States, --- U.S. ----, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983), but the failure to hold a hearing constitutes an abuse of discretion only where there is evidence that the jury was subjected to influence by outside sources. United States v. Chiantese, 582 F.2d 974 (5th Cir.1978), cert. denied, sub nom. Cerrella v. United States, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). Discussions among the jurors as to their fear of the defendants are not inappropriate, so long as such discussions do not lead them to form an opinion of the defendants' guilt or innocence of the offenses charged. United States v. Yonn, supra. There is no evidence that the jurors' fear created any danger of this result. Juror Merkison expressed to the court her confidence that she could reach a verdict on the evidence; moreover, the jury ultimately convicted 13 of the 14 defendants, a result which hardly betrayed the influence of a fear of retribution.[3]
 
 
 8
 Appellants' final claim, that their constitutional right to be present during the trial was infringed by their exclusion from the ex parte conference, merits closer attention. The Supreme Court recently considered a similar claim in United States v. Gagnon, --- U.S. ----, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), rev'g United States v. Gagnon, 721 F.2d 672 (9th Cir.1983). In Gagnon, a juror had become alarmed when he noticed one of the defendants in a criminal conspiracy trial making sketches of the jurors. An in camera conference was subsequently held between the judge, the juror and the defendant's lawyer, at which the judge assured the juror that though the defendant was an artist and the sketching reflected no danger, the practice had been stopped. No objection was raised to the absence of the defendants from the conference. The Court concluded that "the mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right." --- U.S. at ----, 105 S.Ct. at 1486 (quoting Rushen v. Spain, 464 U.S. 114, 125-26, 104 S.Ct. 453, 459-60, 78 L.Ed.2d 267 (Stevens, J., concurring)); a defendant has a due process right to be present at a proceeding only when "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Id. (quoting Snyder v. Massachusetts, 291 U.S. 97, 106-08, 54 S.Ct. 330, 332-33, 78 L.Ed. 674 (1934)). In Gagnon, where the conference was only a "short interlude in a complex trial" at which the defendants' presence could not have been helpful and might have been harmful, their absence created no violation of due process. While their exclusion appeared to violate Rule 43, Fed.R.Crim.P., the Court held that the error was rendered harmless by the failure of defendants to object. A similar conclusion is required in the instant case. The conference was a "short interlude in a complex trial", and the presence of the defendants was not only unnecessary to a full defense, but might have had an adverse effect on Juror Merkison. Any error under Rule 43 was rendered harmless by the conduct of the district court. Not only did the judge take great care in framing his comments to Juror Merkison, he made transcripts of the meeting available to counsel, and entertained objections to the meeting in the form of post-judgment motions. Counsel had ample opportunity to discover, and the court to evaluate, any prejudice to defendant's interests that may have arisen from the conference. See United States v. Yonn, supra, 702 F.2d at 1345 (error harmless where all parties subsequently provided with transcripts of meeting and court exercised caution in speaking with jurors); United States v. Dumas, 658 F.2d 411 (5th Cir.1981), cert. denied, 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982). The district court's ex parte conference with Juror Merkison provides no basis for reversal.
 
 III. Double Jeopardy
 
 9
 Appellant Hart argues next that his prior conviction on two substantive counts of violating 18 U.S.C.A. Sec. 1952(a)(1) and one count of conspiracy to violate 18 U.S.C.A. Sec. 1952(a)(1) requires that this RICO action should be dismissed as to him on grounds of double jeopardy.
 
 
 10
 The guidelines for resolving double jeopardy questions in the context of a RICO action are established in United States v. Phillips, 664 F.2d 971 (5th Cir. Unit B 1981), cert. denied, sub nom. Meinster v. United States, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). In that case, the court considered whether a RICO prosecution could be barred on double jeopardy grounds as to a defendant who had been convicted of substantive and conspiracy violations of 21 U.S.C.A. Sec. 848, a statute concerned with continuing criminal enterprises to violate drug laws. The court in Phillips took its bearings from Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which established the standard for determining whether two offenses are the same for purposes of double jeopardy. The Blockburger standard states that two offenses are distinct for double jeopardy purposes if "each provision requires proof of an additional fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182. While this standard has sometimes been referred to as the "same evidence test," its actual focus is not on the evidence adduced at trial but on the elements of the offense as charged. Phillips, 664 F.2d at 1006. While the Blockburger standard is more difficult to apply to complex conspiracy prosecutions, the court in Phillips followed the lead of the Supreme Court in taking the standard into this new territory as well. In Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), the Court considered whether a single conspiracy to import marijuana could constitute separate offenses of 21 U.S.C.A. Sec. 963 (conspiracy to import) and 21 U.S.C.A. Sec. 846 (conspiracy to distribute). Noting that the characteristic defining the scope of a conspiracy is the agreement, the Court held in Albernaz that the Blockburger test was satisfied if each statute required proof of a fact the other did not and was directed toward a different objective of the general conspiratorial agreement. The court applied a similar test in Phillips and determined that Section 848 and the RICO statute not only had different elements but were directed toward different types of agreements.
 
 
 11
 An application of the modified Blockburger test to 18 U.S.C.A. Sec. 1952(a)(1) and 18 U.S.C.A. Sec. 1962(c), (d) suggests a similar result. A brief consideration of the elements necessary to prove each crime reveals that each requires proof of at least one fact which the other does not. Proof of violation of Section 1952(a)(1) requires the government to demonstrate that the defendant (1) traveled in interstate commerce or used interstate facilities (2) to distribute the proceeds of (3) any unlawful activity (further defined in Section 1952(b) as a business enterprise involving, inter alia, prostitution offenses in violation of the laws of the state in which they are committed). Proof of violation of the RICO statute requires the government to demonstrate (1) the existence of an enterprise affecting interstate or foreign commerce, (2) the defendant's association with the enterprise, (3) the defendant's participation in the conduct of the enterprise's affairs and (4) that the participation was through a pattern of racketeering activity, as indicated by the commission of at least two racketeering acts, as specified in Section 1961(1) (including use of interstate facilities to distribute proceeds of illegal activities). United States v. Bright, 630 F.2d 804 (5th Cir.1980). Section 1952 requires certain elements that a Section 1961 prosecution need not establish (although of course the proof may be similar or overlapping for both): travel or use of interstate "facilities," and the distribution of proceeds through such facilities.[4] And the RICO statute requires proof of at least one element that Section 1952 does not: the existence of an "enterprise," proof of which must be separate from the "pattern of racketeering activity" both statutes appear to require.
 
 
 12
 This is perhaps the most important difference between Section 1952 and the RICO statute: the extent to which they are aimed at, and consequently require proof of, the independent existence and activity of an "enterprise." While 1952 refers to a "business enterprise," courts have tended to interpret the phrase as denoting an ongoing rather than sporadic course of criminal conduct. See United States v. Davis, 666 F.2d 195, 202 n. 10 (5th Cir. Unit B 1982) (term "business enterprise" as it is used in Section 1952 means a "continuous course of conduct, rather than sporadic casual involvement in a proscribed activity"); United States v. Cozzetti, 441 F.2d 344, 348 (9th Cir.1971) (same definition). The enterprise under Section 1961 is neither defined nor its existence established by its pattern of criminal conduct. A prosecutor must present evidence of "an ongoing organization, formal or informal ... [that] function[s] as a continuing unit," United States v. Cagnina, 697 F.2d 915, 920 (11th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983), before he can demonstrate the predicate acts that make for continuous criminal activity. This difference in the conception and proof of an "enterprise" also makes for a difference in the "agreement" at which the statutes are aimed. Though the organization being prosecuted may be the same (as it was in appellant Hart's prosecutions), the agreement at which the prosecution is aimed in a Section 1952 violation is an agreement to engage in a continuous course of (prostitution) offenses (whose proceeds are distributed through interstate facilities); the agreement in a Section 1962 violation is to be part of an enterprise which supports itself and advances its interests through criminal activity. Because the instant statutes meet both prongs of the Blockburger test, the prosecution of the RICO violation does not violate appellant Hart's right against double jeopardy.
 
 IV. Amendment of the Indictment
 
 13
 Appellants Keating and Graves argue that the court deprived them of their Fifth Amendment right to be tried solely on an indictment filed by a grand jury, Ex Parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), by amending the terms of their indictments during the course of the trial.[5] Keating claims that the court effected such amendment by defining "extortion" by reference to the Florida Extortion Statute, the terms of which are different than the description of extortionate acts contained in the indictment. Graves argues that the amendment occurred when the court deleted, for lack of evidence, certain predicate acts with which he had been charged in the indictment. Appellants cite cases such as Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), in which the conviction of a defendant indicted for unlawfully interfering with the movement of sand in interstate commerce was reversed because the trial court instructed the jury that the defendant could be convicted for interference with interstate shipments of either sand or steel. See also United States v. Bizzard, 615 F.2d 1080 (5th Cir.1980), cert. denied, 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 286 (1982) (conviction reversed because court instructed on assault as well as indictment offense of robbery by force, violence or intimidation); United States v. Figueroa, 666 F.2d 1375 (11th Cir.1982) (conviction reversed because court instructed on charge of air piracy by "threats and intimidation" rather than the indictment offense of air piracy by "force and violence").
 
 
 14
 Such cases, however, have little bearing on the action of the court in Keating's case. The court did not change the terms of the crime with which Keating was charged (when enumerating the charges against Keating, the court simply said "extortion"); it offered the Florida statute as an illustration of the activities which were considered to fall within the category of "extortion" under state law. This illustrative use of state statutes in connection with RICO charges has been approved by this Circuit, which has held that "references to state law serve a definitional purpose, to identify generally the kind of activity made illegal by the federal statute." United States v. Welch, 656 F.2d 1039, 1058 (5th Cir.1981); United States v. Salinas, 564 F.2d 688, 690 (5th Cir.1977), cert. denied sub nom. Davis v. United States, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800 (1978). Courts have held that the definitional citation of an incorrect or inapplicable part of a state statute, United States v. Welch, supra, or a statute which the predicate acts of a RICO defendant do not offend, United States v. Frumento, 563 F.2d 1083 (3rd Cir.1977), cert. denied sub nom. Millhouse v. United States, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), quoted in United States v. Salinas, supra, does not require the reversal of a RICO conviction, because the state law reference is not employed to provide the specific terms of the charge. The state law citation merely serves to indicate "the type of serious conduct contemplated by the RICO statute as actionable as an act of racketeering." United States v. Welch, supra, 656 F.2d at 1058. These cases mandate a similar result in Keating's case: because the state statute is not relied upon to specify the terms of the offense, its citation cannot vary or amend the terms of indictment.
 
 
 15
 It is not clear that cases such as Stirone, Bizzard and Figueroa apply to Graves, either. Neither these cases nor any other case in which an unconstitutional amendment of an indictment has been found concern the deletion of predicate acts from an indictment. Moreover, while the court's action in Graves' case had a more direct effect on the charges enumerated in the indictment, not all such alterations constitute "amendments" which require reversal of the conviction. An alteration may constitute a non-reversible "variance," when the charge remains the same but the evidence presented is different, or when the charge is altered in such a minor way that "we can be sure that the grand jury would indict the defendant ... irrespective [of the change]," United States v. Figueroa, supra, 666 F.2d at 1379 n. 2. A change constitutes an "amendment" only when the difference between the charge originally filed and the charge subsequently described is so great that "we cannot say with equal certainty that a grand jury would have indicted ..." on the latter charge. Id. With respect to Graves, the grand jury indicted on the basis of four separate predicate acts, of which the court subsequently struck two. Yet because RICO requires the proof of only two predicate acts, it seems extremely likely that "the grand jury would indict the defendant ... irrespective [of the change]." Thus the court's intervention produced only a "variance," which does not require reversal of appellant's conviction.
 
 V. Evidence from State Wiretaps
 
 16
 Appellants argue next that the indictment should have been dismissed because the government disclosed to the grand jury evidence intercepted by state wiretap, which had been obtained without securing a disclosure order, as required by 18 U.S.C.A. Sec. 2517(5). Section 2517 sets forth the authorization requirements for use of intercepted wire or oral communications. Subsection (3) provides that "any person who has received ... evidence derived [from a wire or oral communication] intercepted in accordance with the provision of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath ... in any court of the United States...." But Subsection (5) creates an exception where the intercepted material relates to "offenses other than those specified in the order of authorization." In such cases, the government must obtain an authorization from "a judge of competent jurisdiction," reflecting his determination that "the contents were otherwise intercepted in accordance with the provision of this chapter," before it can disclose such materials.
 
 
 17
 In the instant case, one state order authorized interception of communications relating to "the delivery and sale of controlled substances, to wit: Diazepam, commonly known as valium; Lysergic Acid Diethylamine, commonly known as LSD; Cannabis; Methaqualon ...." A second state order included communications relating to the delivery and sale of Cannabis and Diazepam (valium). Appellants argue that, by disclosing these materials to a grand jury considering RICO (rather than drug law) violations without obtaining any prior authorization, the government violated Section 2517(5).[6] Appellants cite two cases, United States v. Brodson, 528 F.2d 214 (7th Cir.1975), and Marion v. United States, 535 F.2d 697 (2d Cir.1976), in which indictments were dismissed after the government used intercepted materials in grand jury proceedings relating to a violation not described in the original order, without obtaining an authorization. They claim that this precedent requires the dismissal of the indictments in this case.
 
 
 18
 Marion and Brodson, however, are not binding precedent in this Circuit; the single binding case that has considered the effect of Section 2517(5) on grand jury evidence, United States v. Campagnuolo, 556 F.2d 1209 (5th Cir.1977), was far less rigid in its conclusions.[7] The court concluded that the phrase "relating to offenses other than those specified in the order of authorization" must be understood by reference to congressional intent: "Congress wished to assure that the Government does not secure a wiretap authorization order to investigate one offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order are lacking." 556 F.2d at 1214. Although the court in Campagnuolo did not elaborate, understanding the authorization requirement as a means of preventing governmental subterfuge appears to permit a more flexible interpretive approach. For example, courts could relax the authorization requirement in cases where the offense for which the wiretap was authorized and the offense for which the information was used were so similar in nature that there would be little chance that the original authorization was a "subterfuge" to obtain evidence of an offense "for which the prerequisites to authorization are lacking." Cf. United States v. Moore, 513 F.2d 485, 502 (D.C.Cir.1975) ("similar offense" exception to District of Columbia analogue to Section 2517(5)).
 
 
 19
 Even if Campagnuolo does not go so far as to permit a general "similar offense" exception to the authorization requirement, two features of the instant case suggest that the rationale of Campagnuolo would authorize the use of the wiretap evidence here. First, the prosecution under the RICO statute bears a unique kind of similarity to the prosecution under the drug law. It is not merely a question of crimes which have "some common elements" or "some overlapping proof": where, as here, a drug offense is one of the predicate acts for the RICO violation, every element of that offense must be proven before the RICO violation can be established. Although the object of the RICO statute might be different, the extent of similarity in what must be proved makes "subterfuge" virtually impossible; the government might seek, in the long run, to offer additional proof against the "enterprise," but in the context of the intercepted conversation, it is most likely that the government is interested in offering evidence of the predicate offense. Second, the authorization order in this case did not specify any offense by statute or code reference. Not only does this distinguish the instant case from Brodson and Marion, both of which had orders specifying particular statutes; but the generality of the state's object drastically reduces the possibility of federal "subterfuge." It is difficult to claim that the federal government had a different object in mind in disclosing the material than the state did in intercepting it, when the state defined its object with such generality.
 
 
 20
 Finally, some courts have held that dismissal of the indictment may not be an appropriate response, even where the requirements of Section 2517(5) have not been met. See United States v. Vento, 533 F.2d 838, 856 (3rd Cir.1976); United States v. Aloi, 449 F.Supp. 698, 721 (E.D.N.Y.1977). These cases suggest that sanctions should be applied flexibly, and with an awareness of the purposes of the provision. 449 F.Supp. at 721. The special similarity of the offenses and the failure to specify a particular statute in the original order make it clear that the goals of the provisions of Section 2517(5) would not be served by a dismissal of the indictments.
 
 VI. Admissibility of the Evidence
 
 21
 Appellants argue that numerous pieces of evidence, including physical evidence, tapes of intercepted conversations and testimony by witnesses, should not have been admitted by the trial court and their admission constitutes reversible error.
 
 A. Exhibit 77
 
 22
 Appellants challenge the admissibility of Exhibit 77, a tape of a telephone conversation between an unindicted co-conspirator named Nolan and an unknown individual identified as "Jim." On this tape, the two discussed various crimes and trials, including one occasion on which Nolan had been acquitted for the murder of three Hell's Angels whom he claimed to have killed. Appellants argue that because numerous crimes and bad acts were discussed, some of which were not shown to have any connection to the indictment, this evidence was less probative than prejudicial and should have been excluded. Appellants also object to the admission of the evidence under 801(d)(2)(E), Fed.R.Evid. They argue that it would not come in under the co-conspirator rule because Nolan's comments were not made in furtherance of the conspiracy, nor were they directed to a member of the conspiracy.
 
 
 23
 None of these claims is sufficient to justify reversal. This Circuit has repeatedly held that Rule 403 should be applied sparingly: "[r]elevant evidence is inherently prejudicial, but it is only when unfair prejudice, substantially outweighs probative value, that the rule permits exclusion." United v. King, 713 F.2d 627, 631 (11th Cir.1983), cert. denied sub nom. McGlocklin v. United States, --- U.S. ----, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984); United States v. Pirolli, 673 F.2d 1200 (11th Cir.), cert. denied, 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982). Probative value is, at least in part, a function of the prosecution's need for the evidence in making its case: the greater the need for the evidence, the greater its probative value. United States v. King, supra; United States v. Mills, 704 F.2d 1553 (11th Cir.1983). In making determinations under Rule 403, the court is accorded broad discretion, which is reviewed only for clear abuse. United States v. King, supra. With respect to Exhibit 77, the prosecutorial need for the evidence was substantial: Nolan, a "closet" Outlaw, served as the primary connection between defendant Nail and defendant Watchmaker; it was necessary to document his activities to establish his connection (and ultimately the connection of the others) with the Club. Moreover, the prejudice resulting from the tape could not be said to be "unfair" or "substantial." The record, as appellants note, was replete with testimony concerning the violent and illegal activities of the Outlaws: it is unlikely that one additional conversation had a particularly detrimental effect.[8]
 
 
 24
 As to the Rule 801(d)(2)(E) objection, it is possible that the conversation came within the scope of the exception. Statements made to a non-conspirator in order to induce him to become part of a conspiracy come within the exception as furthering the purposes of the conspiracy. United States v. Goodman, 605 F.2d 870, 877-78 (5th Cir.1979). Because we know little about "Jim" or his relation to the Outlaws, we cannot discern with certainty the purpose of the conversation; but it seems plausible that Nolan's bragging about his exploits was part of an inducement to "Jim" to join in his activities. Even if it was not, any error in its admission was most likely harmless. United States v. Poiter, 623 F.2d 1017 (5th Cir.1980) (admission of co-conspirator hearsay harmless where there was substantial evidence of defendant's guilt).[9]
 
 B. Admission of Appellant Lackey's Scales
 
 25
 The district court denied the motion of appellant Lackey to suppress a set of scales that had been taken from his apartment during a police search. Lackey argues that this denial was reversible error. On November 2, 1982, several police officers, led by detective Locke, came to Lackey's apartment to serve a warrant for his arrest. They were let in by Harold Scroggins, who was at that time living in the apartment with Lackey and who then informed them that Lackey was not there. Soon after his entry into the apartment, detective Locke saw the scales on a table in the kitchen area near the entry to the apartment. In learning that Lackey was not home, the detective sought and received Scroggins' consent to search the apartment. The men went first to Scroggins' bedroom, where they found some firearms. Scroggins stated that they belonged to Lackey, who had authority over the house and placed his belongings in whatever room he chose. Locke then concluded that Scroggins did not have authority to give his consent to a search of the house, so the officers left. They obtained a warrant and returned to the house, at which time they took the scales from the table in the kitchen.
 
 
 26
 Both the magistrate and the district court held that the seizure was appropriate under the "plain view" doctrine. This doctrine permits the seizure of objects which fall within the "plain view" of an officer who has a right to be in the position to have that view. United States v. Jonas, 639 F.2d 200, 203 (5th Cir.1981); United States v. Bolts, 558 F.2d 316 (5th Cir.), cert. denied sub nom Hicks v. United States, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The application of this doctrine to the instant case is appropriate, as detective Locke had a right to be in the apartment to serve Lackey's arrest warrant, and the scales were readily visible from the entry where he stood. It also appears that, notwithstanding detective Locke's reservations, Harold Scroggins had authority to consent to the search. The Supreme Court held in United States v. Matlock, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974), that "common authority [to consent to a search] rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." The rule has been broadly applied in this Circuit. See United States v. Woods, 560 F.2d 660, 666 (5th Cir.1977), cert. denied, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978) (co-habitant who was not known to be co-owner of house had authority to consent to search). Scroggins' statement that Lackey could use the space in his apartment any way he pleased without consulting Scroggins may appear to distinguish the instant case. But the context of the statement suggests that it was intended to establish Scroggins' innocence in connection with the firearms that had been discovered in his bedroom, and should not be understood as an explanation of his authority over the apartment.
 
 
 27
 The fact that the officers did not seize the scales at the time they initially entered, and were obliged to enter a second time, does not alter the validity of the seizure. The officers entered the second time on the basis of a warrant. While the government suggested at the suppression hearing that the warrant may have been invalid, detective Locke indicated that he believed in its validity at the time of the search, and appellant does not dispute this belief. Where government agents have a good-faith belief in the validity of a warrant at the time that it is used, the seizure of evidence pursuant to that warrant is not improper, though the warrant is later found to be invalid. United States v. Leon, --- U.S. ----, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). More importantly, the police still had a warrant for the arrest of Lackey, on the basis of which they could have entered his apartment a second time. As the second entry was not unauthorized, and the object seized had been spotted "in plain view," its seizure did not violate Lackey's Fourth Amendment rights.[10]
 
 C. Testimony of Hazel Crissman
 
 28
 Appellant Keating argues that the court should have suppressed the testimony of Hazel Crissman concerning one occasion on which he supplied her with quaaludes. Keating argues that Crissman was, at the time in question, meeting regularly with members of the Jacksonville sheriff's office. As a de facto government agent, Crissman had an obligation to preserve any evidence that came into her control. United States v. Nabors, 707 F.2d 1294 (11th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1271, 79 L.Ed.2d 677. But instead of saving the quaalude she was given, Crissman took it. Keating argues that this failure to fulfill her governmental obligation justifies exclusion of Crissman's testimony.
 
 
 29
 Keating's argument is flawed in several respects. First, no formal relationship has been established between Crissman and the sheriff's department which would justify her assumption of the department's preservation obligations. Second, there is no allegation of any relationship between Crissman and agents of the federal government, the "government" that brought the RICO action and would have had the attendant duty to preserve the evidence in this case. And finally even had Crissman had such a duty, her failure to save the quaalude would not necessarily have required the exclusion of her testimony. Whether a failure to preserve evidence rises to the level of a deprivation of due process and mandates exclusion of related testimony depends on the likelihood of mistakes in the identification of the evidence and the reasons for its non-availability. United States v. Herndon, 536 F.2d 1027, 1029 (5th Cir.1976). In this case there would be little chance that the substance in question would be misidentified, regardless of whether it was available in court.
 
 
 30
 D. Question Concerning Gibson's Past Conviction
 
 
 31
 Appellant Gibson argues that the court erred in denying his motion for a mistrial after the government, on cross-examination, asked him if he had been convicted of an offense involving methaqualone (quaaludes). Gibson argues that this question, which was never answered, was irreparably prejudicial. Gibson states that under Rule 609(a), Fed.R.Evid., and cases such as United States v. Preston, 608 F.2d 626 (5th Cir.1979), cert. denied, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980), evidence of a prior conviction may be admitted only after an on-the-record determination by the trial court that the probative value of such evidence outweighs its prejudicial value. Gibson correctly notes that no such determination was made in this case.
 
 
 32
 Evidence of past convictions need not be subjected to these restrictions, however, if it is offered for purposes other than impeaching a witness. See United States v. Opager, 589 F.2d 799 (5th Cir.1979) (evidence offered to contradict direct testimony not subject to restrictions of Rule 608(a)). The government argues that on direct examination Keating had equivocated in a self-serving manner concerning his involvement with the sale of drugs and the drug-trafficking schemes of the Outlaws. It claims that evidence of an earlier conviction was intended to counter the implication of Keating's testimony that he was unfamiliar with the world of large-scale drug traffic. Not only would the evidence of a conviction have been useful in dispelling this illusion, but since objection was immediately made and the question was never answered, any error in permitting the question seems likely to have been harmless.[11]
 
 VII. Sufficiency of the Evidence
 
 33
 Virtually all appellants argue that the evidence is insufficient to demonstrate their connection with the "enterprise" or their commission of the requisite number of predicate acts. The standard of review for this claim is "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In making this determination, all evidence must be viewed in the light most favorable to the government, and it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. United States v. Bell, supra; Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).
 
 
 34
 The most plausible sufficiency claim is raised by appellant Ruby. When the court struck the predicate act of drug distribution that had been included in the indictment, the government was left with only the Tampa Clubhouse shootings as evidence of Ruby's participation in the "enterprise." Because the grand jury considered this to be one predicate act, Ruby argues that the evidence is not sufficient as a matter of law to convict him of a RICO offense. Ruby further points to Teleprompter of Erie, Inc. v. City of Erie, 537 F.Supp. 6 (W.D.Pa.1981), in which the court found that the solicitation of numerous bribes in the same evening constituted only a single predicate act of solicitation and was not sufficient to bring the defendant within the RICO statute. The government, on the other hand, argues that the Clubhouse shootings constituted not one, but three predicate acts, because Ruby deliberately shot three separate officers. It argues that the virtual simultaneity of the shootings provides no basis for denying their quality as distinct acts, under the law of this and other circuits.
 
 
 35
 As the government notes, most courts have rejected the claim that predicate acts which are proximate in time do not demonstrate the "continuity" necessary for proof of a RICO offense. See United States v. Parness, 503 F.2d 430 (2d Cir.1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975) (two acts of interstate transportation of stolen property five days apart sufficient to establish RICO violation); United States v. Moeller, 402 F.Supp. 49, 57-58 (D.Conn.1975) (one act of arson and one act of kidnapping on same day sufficient to establish RICO violation). Courts have also rejected the argument that acts which are part of the same scheme or transaction cannot qualify as distinct predicate acts. See United States v. Phillips, supra, 664 F.2d at 1038-39 (describing case in which several mailings in course of single mail fraud constituted separate acts and case in which single arson constituted multiple predicate acts because of violation of mail fraud and interstate travel laws in course of planning and executing arson). The standard which has been applied in this Circuit is whether each act constitutes "a separate violation of the [state or federal] statute" governing the conduct in question. United States v. Phillips, supra, 664 F.2d at 1039. See also United States v. Licavoli, 725 F.2d 1040 (6th Cir.), cert. denied, sub nom. Calandra v. United States, --- U.S. ----, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984) (same standard). If distinct statutory violations are found, the predicate acts will be considered to be distinct irrespective of the circumstances under which they arose. Compare United States v. Phillips, supra, 664 F.2d at 1038-39 (two predicate acts not proved where possession with intent to distribute and distribution of drug constituted single statutory offense), with id. at 1039 (two predicate acts proved where defendant violated aiding and abetting attempted importation statute and travel in foreign commerce in aid of racketeering statute, despite fact that violations occurred within same transaction). The Phillips standard clearly controls the instant case[12]; because Ruby perpetrated three separate violations of the attempted murder statute, he committed three predicate acts which are sufficient to constitute a violation of the RICO statute.
 
 
 36
 Among the remaining appellants, Gibson and Marcaccio raise sufficiency claims that are somewhat stronger, as their involvement with the Outlaws does not appear to be as extensive as that of several others of the appellants (Gibson, for example, was only a probate member of the Club). Yet the RICO statute was not designed to apply only to the "kingpins" of criminal enterprises. As the court observed in United States v. Elliott, 571 F.2d 880, 903 (5th Cir.), cert. denied sub nom. Hawkins v. United States, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978): "The substantive proscriptions of the RICO statute apply to insiders and outsiders --those merely "associated with" an enterprise--who participate directly and indirectly in the enterprise's affairs through a pattern of racketeering activity ... The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise" (citations omitted). There is evidence that both men were 'associated with' the enterprise, if only temporarily; moreover, there is evidence that each participated in its affairs through a series of acts of "racketeering": Gibson through two acts of extortion (committed with other Club members) and several instances of drug distribution; Marcaccio through several cocaine transactions, culminating in the robbery of an intermediary, and the purchase of quaaludes at the behest of chapter leader Harrell.
 
 
 37
 As to appellant White, who argues that the evidence establishes only one incident of extortion rather than three, there is a conflict in the evidence rather than an insufficient amount of evidence. As was brought out at trial, Nora Henson testified to the grand jury that she feared for her life once she had been subpoenaed. (Extortion of a grand jury witness was one of the predicate acts as to which White argued proof was lacking). Although she stated that it was her observation of the general practices of the Outlaws which produced such fear, she made the comment concerning her fear only days after being summoned for a conversation with White, who had learned of her subpoena. Although Henson stated at trial that White had made no threats during their conversation and she did not feel endangered at the time of her grand jury appearance, the jury was entitled to believe whichever account of the period surrounding her grand jury testimony it found to be more credible.
 
 VIII. Motions for Severance
 
 38
 Virtually all appellants argue that the court erred in denying their motions for severance. Each states that the evidence against him was de minimis as compared with the evidence against the others, and that he was consequently prejudiced by the "spillover" effect. This Circuit has displayed great reluctance to grant motions to sever on the basis of "de minimis evidence" arguments such as the one advanced in this case. United States v. Bolts, supra; United States v. Morrow, 537 F.2d 120 (5th Cir.1976), cert. denied sub nom. Brennan v. United States, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). The denial of a motion for severance is reversible only for an abuse of discretion, and a showing of compelling prejudice must be made before a trial court's ruling will be viewed as an abuse of discretion. United States v. Phillips, supra, 664 F.2d at 1016; United States v. Bright, supra, 630 F.2d at 813. A reviewing court must consider whether the jury could "individualize each defendant in his relation to the mass," Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Phillips, supra, 664 F.2d at 1017, that is, whether the jury could avoid cumulating the evidence against all of the defendants and could make individualized guilt determinations. United States v. Bright, supra, 630 F.2d at 813. The jury's ability to reach different verdicts as to different defendants is one factor which weighs in favor of the jury's ability to make individualized determinations and against a finding of abuse in refusing severance. United States v. Kopituk, 690 F.2d 1289, 1320 (11th Cir.1982).
 
 
 39
 There is little basis for concluding that the district court abused its discretion in denying appellants' motions for severance in this case. While appellants, as in most RICO cases, varied in the strength of their connection with the enterprise and in the number of acts of racketeering of which they had been accused, there was sufficient evidence to suggest that each had at least a temporary association with the Club and had committed at least two predicate acts of racketeering. More importantly, the acquittal of defendant Nail demonstrates that the jury was able to make individualized determinations, and that appellants were not prejudiced by a joint trial.
 
 IX. Consecutive Sentences
 
 40
 Appellants argue next that the court erred in imposing consecutive sentences for their violations of Sections 1962(c) and 1962(d). They state that in United States v. Sutton, 642 F.2d 1001 (6th Cir.) (en banc), cert. denied, 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981), the court held that, where the evidence used to prove violations of the substantive and conspiracy provisions is the same, the sentences for the two should be merged.
 
 
 41
 Although this Circuit does not appear to have addressed a challenge to consecutive sentencing under the reasoning applied in Sutton, the double jeopardy rule which has been applied in this Circuit suggests that it would not reach the same result as the Sutton court. Following the lead of the Supreme Court in Albernaz v. United States, supra, this court has applied the Blockburger test to double jeopardy in sentencing as well as in prosecution. That test, as discussed above, requires courts to consider not the evidence adduced at trial but the elements of the crimes as charged. Because subsections (c) and (d) of the RICO statute require proof of different elements, and because the legislative history of the statute evinces no contrary intent, this Circuit has held that consecutive sentencing for violation of these provisions is permissible. United States v. Bagaric, 706 F.2d 42, 63-64 n. 18 (2nd Cir.), cert. denied sub nom. Logarusic v. United States, --- U.S. ----, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). The reasoning applied in Bagaric is clearly applicable to the instant case as well.
 
 X. Multiple Conspiracies
 
 42
 Finally, appellants argue that their convictions should be reversed because the evidence proved multiple conspiracies rather than the single conspiracy required by RICO. Because of the variety of activities which may be undertaken by a criminal enterprise, there are few RICO trials in which such a claim could not be made, and it has been soundly rejected by the courts of this Circuit. In United States v. Elliott, supra, 571 F.2d at 902-03 the court stated:
 
 
 43
 "[T]hrough RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate "wheel" and "chain" rationales with a new statutory concept: the enterprise ... Under the statute is it irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs.
 
 
 44
 The evidence offered in this case demonstrates that the Outlaw Motorcycle Club, with its drug and prostitution rings, fits neatly into this classification. Appellants' argument provides no basis for reversal.
 
 
 45
 The judgment of the district court is AFFIRMED as to each appellant.
 
 
 
 [1]
 Given the virtually universal adoption of arguments among appellants, most claims will be described as being raised by "appellants," although a given claim may not appear in every brief. Appellants will be referred to by name when a claim relates to the activities or property of one or more (but not all) of them
 
 
 [2]
 The relevant portions of the discussion between the court and Juror Merkison are as follows:
 THE COURT: Okay. What is the problem?
 JUROR MERKISON: To make a long story short, just fear.
 THE COURT: Pardon?
 JUROR MERKISON: Fear of what--after this, what happen [sic] to me, my family, because it was brought to my attention by Gloria, she's changed--with this grand jury, she's changed her phone number and she's not even living at her house, she's in fear. And the guy mentioned yesterday he allows no one--pick his kid up from school and then, you know, thinking about it overnight and supposedly--
 THE COURT: Who is doing this?
 JUROR MERKISON: 1200 or 1500 more members in this club and--just fear; if they're convicted, what would happen after this to me or my family or even them.
 * * *
 THE COURT: Now, this has gone a long time, it has taken the time of several people, all the witnesses, all the attorneys, all the defendants, and both sides are entitled to have you follow your oath as a juror or that you took originally, and render a verdict, whatever that verdict might be.
 * * *
 THE COURT: And regardless of anything, fear or--of reprisal or anything like that, why, I think you owe it to all of us, everyone to--and I'm not suggesting how you should decide this case, that's strictly and solely within your province, you as one of the twelve jurors. But I--as I say, I think you owe it to the system and to the parties particularly in this case--
 JUROR MERKISON: Yes, sir.
 THE COURT: Do you think that you can do that now?
 JUROR MERKISON: Yes, sir, I can do that. Yes, sir, I promise you I can do that.
 THE COURT: Okay. You've heard the evidence and you have heard my charges on the law, and thing to do is just go back in there and work with those other eleven people and try to reach a verdict--
 * * *
 THE COURT: But I would like for you to go back in there and really work with those other eleven people and consider it really an honor that each of the twelve of you was selected to be the jurors in this case.
 JUROR MERKISON: Yes, sir, I do.
 THE COURT: And render a fair verdict, whatever that might be.
 JUROR MERKISON: Yes, sir, I will do that.
 
 
 [3]
 Even less meritorious is appellants' claim that the venire was subjected to prejudicial outside influences when all members not being questioned were placed in an adjacent courtroom during the individual, sequestered voir dire. This situation is entirely distinguishable from that in United States v. Herring, 568 F.2d 1099 (5th Cir.1978), where the jury was exposed to a newspaper article describing death threats to a key prosecution witness. Appellants can point to no authority which suggests that simple exposure to the routine business of a criminal court is prejudicial to a jury's impartiality
 
 
 [4]
 While travel or use of interstate facilities may be an element which must be proved in some RICO cases (i.e., those involving a Section 1952 violation as a predicate offense), it is not an element which must be proved in every RICO case, as is, for example, the existence of an "enterprise," or an effect from the activities of this enterprise on foreign or interstate commerce. The fact that interstate travel may sometimes be part of the proof of a RICO offense is not sufficient to establish that the two statutes contain identical elements for purposes of double jeopardy. Cf. United States v. Phillips, supra, 664 F.2d at 1010 n. 58 (fact that proof of RICO violation may sometimes involve proof of drug related offense does not make RICO and Section 848 identical for purposes of double jeopardy)
 
 
 [5]
 Appellant Ruby also argues that the court's subsequent deletion of one predicate act constituted an amendment of his indictment. Ruby's case is somewhat more difficult than that of appellant Graves, because when the court struck one predicate offense from the indictment, the government was left with only one other, which is less than the two predicate acts required for conviction under the RICO statute. The government argues that the remaining offense--the Tampa Clubhouse shootings--was, in fact not one offense but three, because appellant shot three law enforcement officers. As the terms of this problem suggest, appellant Ruby's argument is best addressed as one concerning the sufficiency of the evidence as a matter of law, and will be considered in that context below
 
 
 [6]
 The record reflects that the court issued a nunc pro tunc approval of the disclosure on January 20, 1983, but such authorization does not conform to the requirements of the statute
 
 
 [7]
 The government in Campagnuolo actually used the materials for a prosecution under the specified statute, but the court considered the Section 2517(5) issue because the intercepted conversations also contained evidence which might have been germane to a prosecution for a different offense
 
 
 [8]
 The same argument applies to appellants' argument that the testimony of Iris Geoghagan as to her experience with Nolan in Arizona should have been excluded. This evidence served to establish Nolan's connection with the prostitution activities of the enterprise
 
 
 [9]
 There are also two additional tapes of intercepted conversations to which appellants object. As to exhibits 57 and 152 there was a conflict in testimony as to whether the state court had renewed the wiretap authorization before the dates on which the recordings were made. The district court, ruling on appellants' motion to suppress, was entitled to credit the testimony of the government that the authorization had been renewed. As to exhibit 83, a conversation between Nolan and Watchmaker to which appellants object on the ground that irrelevant "chatter" was not redacted, the tape in general served the function of connecting Nolan to Watchmaker and any irrelevant "chatter" was almost certainly harmless
 
 
 [10]
 Appellant Keating argues that several articles identifying him with the Outlaw Motorcycle Club, which were taken from his apartment during a state police search, should have been suppressed. He claims that because these items were not specified in the warrant, their seizure violated the rule generally applied to the federal use of the fruit of state searches, that the warrant must "satisf[y] constitutional requirements and [must] not contravene any Rule-embodied policy designed to protect the integrity of the federal courts." United States v. Martin, 600 F.2d 1175 (5th Cir.1979). Even with this explanation it is difficult to understand the basis of Keating's objection. The warrant, which is the focus of the Martin standard, does not appear to have any constitutional or rule-related deficiencies: it clearly specified the items police were authorized to take. The problem, if any, appears to be that the police took items not specified in the warrant. Keating does not explain the circumstances under which these items were sighted and seized, so it is difficult to tell whether such seizure was inappropriate. They may have been in the "plain view" of the officer searching the apartment, for example, and their seizure permissible. At any rate, there was sufficient evidence linking Keating to the Outlaws that the failure to suppress these items, even if error, was harmless
 
 
 [11]
 A similar objection was raised by appellant Ruby to the statement made by a police witness that he recognized Ruby from a mugshot. This statement was not the product of a willful effort by the prosecution to paint Ruby as a criminal; it was a straightforward and responsive answer to the question that had been put to the witness: "do you know Ruby?" In light of substantial testimony that Ruby had attempted the murder of three policemen at the Tampa Clubhouse, an unelaborated suggestion that Ruby was once accused of a crime was unlikely to have been substantially prejudicial. There was no basis for granting appellant's motion for a mistrial
 
 
 [12]
 Teleprompter of Erie, Inc. v. City of Erie, supra, is distinguishable in that the district court for the Western District of Pennsylvania was not bound by the decision of the former Fifth Circuit in Phillips. Moreover, while the court does not discuss the solicitation statute at issue in Teleprompter, it is possible that a single act of bribery does not constitute a solicitation offense under that statute