# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3251

_____

United States of America,      *
     *
        Plaintiff - Appellee,      * Appeal from the United States
     * District Court for the
      v.      * District of Minnesota.
     *
Marvin L. Pullman, also known as      *
Dick Pullman,      *
     *
        Defendant - Appellant.      *

_____

Submitted: May 11, 1999

Filed: August 13, 1999

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

_____

JOHN R.GIBSON, Circuit Judge.

Marvin Pullman appeals his conviction and sentence on three counts, conspiracy to commit offenses against or to defraud the United States, see 18 U.S.C. § 371 (1994), aiding and abetting another in possessing or uttering a counterfeited security, see 18 U.S.C. §§ 2 and 513 (1994), and aiding and abetting the obstruction of the Internal Revenue Service, see 18 U.S.C. § 2; 26 U.S.C. § 7212 (1994). Pullman, Marilyn Kerkvliet, and Milton Bigalk attended a meeting of the Montana Freemen, where the

use of worthless certified money orders was discussed, and Marilyn Kerkvliet, Ronald Kerkvliet (Marilyn's husband) and Kenneth Bigalk (Milton's cousin) submitted such money orders to the I.R.S. in payment of taxes. There was also evidence of use of such money orders with state institutions, and evidence that Pullman participated with the others in filing a false tax return, setting up a fraudulent trust, investing in off-shore accounts, and sending threatening "non-statutory abatements" to the I.R.S. Pullman raises ten issues on appeal. Only his challenge to the conspiracy conviction and his interpretation of 18 U.S.C. § 513 warrant substantial discussion, and we affirm the district court[1] on all issues raised.

Pullman challenges the sufficiency of the evidence on his conspiracy conviction. We view the evidence in a light most favorable to the verdict, giving the verdict the benefit of all reasonable inferences, and will reverse only if the jury must have had a reasonable doubt concerning one of the essential elements of the crime. See United States v. McCarthy, 97 F.3d 1562, 1567 (8th Cir. 1996), cert. denied, 519 U.S. 1139 (1997).

Pullman testified that he became acquainted with Marilyn Kerkvliet, Ronald Kerkvliet, Milton Bigalk, and Kenneth Bigalk in 1991 through 1995. Pullman initially met Milton Bigalk at a sales meeting and later saw him at a meeting concerning tax problems in Canton, Minnesota. Pullman met the Kerkvliets at a "common law" meeting in Dover, Minnesota. Pullman had previous experience with tax and bankruptcy problems and acted as a consultant for Kenneth Bigalk.

In April 1995, Pullman, Milton Bigalk, and Marilyn Kerkvliet traveled together to a Montana Freemen meeting hosted by Leroy Schweitzer. A government agent

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

testified that Schweitzer had a practice of holding seminars in which he instructed the attendants on defrauding the I.R.S. with money orders. The money orders appeared to be drawn on a Montana Bank, but in fact, were worthless. A taxpayer would send a money order to the I.R.S. in an amount double the taxes owed, and when the I.R.S. issued a refund check for overpayment, the proceeds were to be split with Schweitzer. Pullman testified that at the meeting he heard Daniel Petersen, Schweitzer's assistant, state, "the I.R.S. [is] going to arrest all of us." The government entered into evidence tape recordings of the meeting seized from Pullman's business. The recordings showed that at the meeting, Pullman stated that using the money orders was "like playing Monopoly" and that if "we run out, we'll just go make some more." He also stated that he had previously been involved in distributing money orders that had "created havoc" in Washington D.C. At the meeting, Petersen also explained that the money orders had been used to deceive a private entity.

After the meeting, Milton Bigalk gave money orders to Kenneth Bigalk, and the Kerkvliets and Kenneth Bigalk submitted money orders to the I.R.S. in amounts roughly double their tax liability. Kenneth Bigalk submitted another money order to the I.R.S. in the amount of $1,022,236. Pullman possessed a $1,000,000 money order but never submitted it to the I.R.S. or any other entity.

The bank notified the I.R.S. that the money orders were worthless, and the I.R.S. did not credit or refund any proceeds. Milton Bigalk then sent a letter to the I.R.S. reciting that Marilyn Kerkvliet had sent a money order to the I.R.S., that the money order was in accordance with the I.R.S.'s own rules, and that the I.R.S.'s denial of the money order had been "protested." Milton Bigalk also talked to Kenneth Bigalk about sending a letter to the I.R.S. to expedite Kenneth's refund, and Kenneth wrote the letter.

Pullman knew that the Kerkvliets and Kenneth Bigalk had sent money orders to the I.R.S., yet he continued to visit Schweitzer and sent him a letter asking for more money orders and indicating that he would funnel them through Marilyn Kerkvliet to

Milton Bigalk and others. The evidence was unclear regarding how these money orders were to be ultimately used.

In August 1995, Pullman knew Ronald Kerkvliet had a $1,000,000 money order and knew that Kerkvliet was going to use the money order as security to become a state notary, yet Pullman notarized an affidavit in attempt to facilitate the process. A computer disk seized from Pullman's house contained a partially completed document, similar to the "protest letter" Milton Bigalk had sent to the I.R.S., except that it referenced Kenneth Bigalk's tender of a "draft" in the amount of $223,518 to the "Farmers Cooperative."

Pullman, the Kerkvliets, and Milton and Kenneth Bigalk formed corporations for investing money in off-shore accounts, and the Kerkvliets gave Pullman a power of attorney with regard to transactions for one of the corporations. Pullman, Milton Bigalk, and Marilyn Kerkvliet organized a seminar on how to use "non-statutory abatements," and Pullman gave an abatement to Kenneth Bigalk, who sent it to the I.R.S. The abatement threatened the I.R.S. with punishment if it did not rescind its notice to levy on Bigalk. Pullman also helped Kenneth Bigalk in Bigalk's efforts to "buy time" with the I.R.S. He helped Bigalk set up a trust, assisted in the preparation of an income tax return falsely reporting Bigalk's trust's income as zero, and notarized a document stating that Kenneth Bigalk was not a United States citizen.

The indictment charged Pullman, the Kerkvliets, Milton Bigalk, and Kenneth Bigalk with conspiring with each other and others in violation of 18 U.S.C. § 371 which penalizes "two or more persons [who] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose . . . ." The conspiracy count alleged a conspiracy to make false claims to the I.R.S., see 18 U.S.C. § 287, to possess or utter a counterfeited security of an organization, see 18 U.S.C. § 513, and to commit mail fraud, see 18 U.S.C. § 1341. It also alleged a conspiracy to defraud the United States under the

second clause of 18 U.S.C. § 371. In defining the manner and means of the conspiracy, the indictment alleged that Schweitzer prepared and executed the money orders,[2] that the defendants possessed them and sent them to the I.R.S., and that the defendants participated in an off-shore investment scheme, created fraudulent trusts and income tax returns, and used intimidating documents to defraud and obstruct the I.R.S. The indictment also contained counts for making false claims to the I.R.S., aiding and abetting the possession or utterance of counterfeited securities, and aiding and abetting the obstruction of the I.R.S. The jury convicted Pullman on conspiracy to commit offenses against or to defraud the United States, aiding and abetting the possession or utterance of a counterfeited security, and aiding and abetting the obstruction of the I.R.S.

## I.

With respect to the conspiracy conviction, Pullman claims there was no evidence of his agreement to defraud the I.R.S. He argues that there is no evidence connecting him to the mailing of any money orders to the I.R.S. He characterizes the evidence as evidence of separate acts, which he states perhaps establish multiple conspiracies, in none of which he participated. He makes no effort to identify or define the separate conspiracies. See, e.g., United States v. Holt, 969 F.2d 685, 687 (8th Cir. 1992) (defendants alleged four separate conspiracies). In essence, his argument is twofold: 1) there is not sufficient evidence from which the jury could conclude he agreed to defraud the United States and 2) the evidence showed multiple conspiracies, rather than the single conspiracy charged in the indictment, and he was prejudiced by the variance between the indictment's charge and the proof.

"Conspiracy is an . . . agreement to commit an unlawful act." Iannelli v. United States, 420 U.S. 770, 777 (1975). "[T]he agreement is the essential evil at which the

---

[2]Schweitzer was not indicted.

crime of conspiracy is directed," and it "serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact." Id. at 777 n.10. The agreement can be inferred from circumstantial evidence. See id. "Once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement." United States v. Smith, 49 F.3d 362, 365 (8th Cir.) (quoting United States v. Ivey, 915 F.2d 380, 384 (8th Cir. 1990), cert. denied, 514 U.S. 1131 (1995).

The evidence and its reasonable inferences showed that Pullman, Marilyn Kerkvliet, and Milton Bigalk attended a meeting in which Schweitzer told them of a scheme to defraud the I.R.S. using money orders. Pullman knew of the scheme's object because of Schweitzer's instructions and because he heard that the I.R.S. was seeking to arrest Schweitzer and others. Pullman showed his consent to join by stating: "[If] we run out [of money orders], we'll just go make some more."[3] Pullman later possessed a money order signed by Schweitzer and continued to contact Schweitzer regarding money orders knowing that his co-conspirators had sent them to the I.R.S. He did not send any money orders to the I.R.S., but that fact alone does not negate a claim of conspiring to defraud the I.R.S.

Placing to one side the evidence unrelated to the money orders, there is ample evidence supporting Pullman's agreement to defraud the I.R.S., and we could hardly say there was not the "slight" evidence necessary to connect Pullman to the established conspiracy amongst the Kerkvliets and Milton and Kenneth Bigalk. See Smith, 49 F.3d 362, 365 (8th Cir. 1995).

---

[3]Although the statement did not reference the I.R.S. and was not made in response to any comments about the I.R.S., the jury could still have reasonably inferred Pullman's consent to defraud the I.R.S. considering the nature of the meeting.

Pullman also overlooks the fact that the indictment charged a conspiracy with multiple objectives, including defrauding the I.R.S. and deceiving other entities with counterfeited securities in violation of 18 U.S.C. § 513. Viewing the conspiracy in this light, the evidence clearly supports Pullman's participation in the conspiracy. In addition to agreeing to join the conspiracy at the meeting, where the participants discussed how the money orders had been used to deceive a private institution, Pullman helped both Ronald Kerkvliet and Kenneth Bigalk in their attempts to pass the money orders to Dakota County and the Farmers Cooperative.

Pullman argues that the indictment charged a single conspiracy, but the government proved multiple conspiracies. We reverse on such a claim if the evidence does not support the single conspiracy and the defendant was prejudiced by the variance between the indictment and the proof. See United States v. Rosnow, 977 F.2d 399, 406 (8th Cir. 1992), cert. denied, 507 U.S. 990 (1993); United States v. Massa, 740 F.2d 629, 636 (8th Cir. 1984), cert. denied, 471 U.S. 1115 (1985).

Whether there are multiple conspiracies or a single one is question of fact for the jury to decide. See United States v. Jenkins, 78 F.3d 1283, 1288 (8th Cir. 1996). The jury determined that a single conspiracy existed after being properly instructed that they were not to convict unless the government proved the single conspiracy alleged in the indictment. We look to the totality of the circumstances to determine whether a single conspiracy or multiple conspiracies existed and give the verdict the benefit of all reasonable inferences that can be drawn from the evidence. See United States v.McCarthy, 97 F.3d 1562, 1570 (8th Cir. 1996). "[T]o prove a single conspiracy it is not necessary to show that all the conspirators were involved in each transaction or that all the conspirators even knew each other." Rosnow, 977 F.2d at 405. "A single conspiracy may be found when the defendants share a common overall goal. . . ." McCarthy, 97 F.3d at 1571 (quoting United States v. Darden, 70 F.3d 1507, 1518 (8th Cir. 1995)). "It is sufficient that the jury finds the co-conspirators were aware of the

general nature and scope of the conspiracy and knowingly joined in the overall scheme." United States v. Zimmermen, 832 F.2d 454, 457 (8th Cir. 1987).

Pullman offers no specific analysis identifying or defining the multiple conspiracies. Instead, he makes general arguments: the government adduced evidence of numerous separate acts, and perhaps of separate criminal conspiracies, none involving Pullman; the government presented evidence of multiple acts with no nexus between the parties; Pullman had no knowledge that the Kerkvliets or Kenneth Bigalk sent money orders to the I.R.S. or that they had tax assessments before using the money orders; Pullman had no role in the others' decisions to use money orders; Pullman's relationship with Kenneth Bigalk was merely that of "paralegal/client"; the evidence regarding the "non-statutory abatements" was not tied to a single agreement between the defendants; the only connection between the defendants was the use of the money orders; and the government relied only on evidence of common association.

Pullman's assertions are belied by the record, and are mostly irrelevant to the question. They merely restate his contention that there was no conspiracy. We reject his contention that we should reverse because of a prejudicial variance between the indictment's charge and the proof.

We have set out above in some detail Pullman's contacts with the Kerkvliets and Milton and Kenneth Bigalk and his knowledge of their actions. Pullman, Marilyn Kerkvliet, and Milton Bigalk were present at the Montana Freemen meeting together. Pullman's statement at the meeting, using the pronoun "we," displays common action and purpose. Within a few weeks of the meeting, money orders were submitted to the I.R.S., and within a few months, Pullman was contacting Schweitzer regarding more money orders to be used by Milton Bigalk, and was helping co-conspirators in their attempts to pass money orders to other institutions. Meanwhile, Milton Bigalk wrote letters to the I.R.S. stating that Marilyn Kerkvliet's money order had been sent in and conformed with I.R.S.'s rules, and encouraged Kenneth Bigalk to write letters to the

-8-

I.R.S. to expedite his refund.  See McCarthy, 97 F.3d at 1571 (time frame in which acts occurred and whether acts facilitated endeavors of other conspirators considered in single conspiracy determination).

The co-conspirators also took actions unrelated to the money orders, some of which occurred in 1996 and 1997.  However, any claim of Pullman's that these acts constituted separate conspiracies is of no aid to him because he participated in each conspiracy, which forecloses a claim of prejudicial variance.  See United States v. Zimmermen, 832 F.2d 454, 457 n.2 (8th Cir. 1987).  The evidence showed that Pullman participated in the money order scheme, the off-shore investment scheme, the sending of "non-statutory abatements" to the I.R.S., the construction of Kenneth Bigalk's fraudulent trust, and the filing of the false income tax return.

## II.

Pullman also claims that the money orders are not "counterfeited" securities under 18 U.S.C. § 513; therefore, he contends his conviction for aiding and abetting the possession or utterance of counterfeited securities cannot stand.  He argues that 18 U.S.C. § 514 (Supp. II 1996),[4] which he was not charged with violating, defines the

---

[4]18 U.S.C. § 514 states:
 (a) Whoever, with the intent to defraud--
 (1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;
 (2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or
 (3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,

offense he committed. He argues that the legislative history of 18 U.S.C. § 514 shows that it is the applicable statute when someone makes up a security "from scratch," rather than altering a genuine security. He relies on a Senate hearing before the Committee on Banking, Housing, and Urban Affairs in which Senator D'Amato stated that 18 U.S.C. § 514 was being passed because criminals "exploited a loophole" in the federal anti-counterfeiting law by "making and passing completely fictitious financial instruments." The Financial Instruments and Anti-Fraud Act: Hearings on S. 1009 Before the Senate Comm. on Banking, Housing, and Urban Affairs, 104th Cong. 1 (1996) ("Hearing"). He also points out that Leroy Schweitzer and the Montana Freemen were mentioned at the hearing as examples of those 18 U.S.C. § 514 was intended to stop. See Hearing at 2.

We reject Pullman's argument. 18 U.S.C. § 513 penalizes the making, uttering, or possessing with intent to deceive a "counterfeited" security of an organization. See 18 U.S.C. § 513(a). It specifically defines "counterfeited" as "a document that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety . . . ." 18 U.S.C. § 513(c)(1) (emphasis added). Pullman's brief ignores that the plain language of 18 U.S.C. § 513 covers instruments that are "made from scratch" and

---

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

(b) For purposes of this section, any term used in this section that is defined in section 513(c) has the same meaning given such term in section 513(c) . . . .

instead replaces the statute's definition of "counterfeited" with its definition of "forged."[5]

There is no language in 18 U.S.C. § 514 which indicates that instruments that are falsely made in their entirety are not "counterfeited" securities as defined in 18 U.S.C. § 513, and indeed, Pullman makes no argument based upon the plain language of 18 U.S.C. § 514.

Pullman relies on the statements in the Senate hearing in his interpretation of 18 U.S.C. § 513. The statements are of little value, see United States v. Price, 361 U.S. 304, 313 (1960) (views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one), and are equivocal. The participants mentioned Schweitzer and the Montana Freemen, but did not refer to the instruments at issue in this case. See Hearing at 2 ("comptroller warrants" and "phony notes"). While the statements at the hearing may lend some support to Pullman's argument, they more than once suggest that 18 U.S.C. § 513 covers instruments, whether they be alterations of genuine documents or falsely made in their entirety, which are drawn on or purport to be drawn on existing financial institutions (the kind Pullman used), while 18 U.S.C. § 514 covers instruments drawn on financial institutions that do not exist or wholly nonexistent types of instruments. See Hearing at 1, 12, 18, 23. However, we need not decide the precise meaning of 18 U.S.C. § 514, a point neither party briefs. Neither the plain language of 18 U.S.C. § 514, nor its legislative history, persuades us that the money orders at issue do not fall within the ambit of 18 U.S.C. § 513.

### III.

---

[5]18 U.S.C. § 513 also penalizes the making, uttering, or possession with intent to deceive of a "forged" security. It defines "forged" as "a document that purports to be genuine but is not because it has been falsely altered, completed, signed, or endorsed, or contains a false addition thereto or insertion therein, or is a combination of parts of two or more genuine documents." 18 U.S.C. § 513(c)(2).

Pullman also argues that 1) there was insufficient evidence to sustain the conviction for aiding and abetting another in the possession or utterance of a counterfeited security, and 2) there was insufficient evidence to sustain the conviction for obstructing and impeding the I.R.S.

The evidence was sufficient to convict Pullman for aiding and abetting the possession or utterance of a counterfeited security.  See 18 U.S.C. §§ 2 and 513. Pullman admitted that he notarized an affidavit knowing that Milton Bigalk was going to use the affidavit and a money order, which Pullman knew was worthless, in attempt to become a notary.   The affidavit and money order were submitted to Dakota County personnel.

The evidence was sufficient to sustain the conviction for aiding and abetting the obstruction of the I.R.S.   See 26 U.S.C. § 7212 (penalizing use of corruption, force, or threat of force to obstruct the administration of Title 26); 18 U.S.C. § 2; United States v. Williams, 644 F.2d 696, 701 (8th Cir.) (physically assisting the filing of false tax forms constitutes violation of 26 U.S.C. § 7212), cert. denied, 454 U.S. 841 (1981). Among other things, Pullman helped Kenneth Bigalk prepare a tax return, falsely reporting Bigalk's trust's income as zero.

## IV.

Pullman argues that 1) the district court erred in admitting evidence of co-conspirators' statements and documents; 2) the district court erred in admitting tape recordings into evidence; 3) the doctrine of strictissimi juris applies to his case; and 4) the district court erred in its application of U.S.S.G. §§ 2F1.1(b)(1), 3B1.1(a), and 3C1.1.

We detect no abuse of discretion in the district court's admission of evidence. The district court followed the proper procedure in admitting the evidence of co-conspirators' statements and documents, and the record supports its finding of a conspiracy. See United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978) (outlining procedure for admission of coconspirators' statements). We reject Pullman's contention that certain evidence, including material on the tape recordings, was irrelevant.

We have carefully considered all of Pullman's other arguments and conclude they are without merit.

Affirmed.

A true copy.

Attest:

CLERK,  U.S.  COURT  OF  APPEALS,  EIGHTH  CIRCUIT.