[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
01/28/2000
THOMAS K. KAHN
CLERK

_____

No. 98-4605
_____

D.C. Docket No. 96-8086-CR-KLR


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARNOLD PAUL PROSPERI ,

Defendant-Appellant.


_____

No. 98-4692
_____

D.C. Docket No. 96-8086-CR-KLR


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

ARNOLD PAUL PROSPERI ,

Defendant-Appellee.

Appeals from the United States District Court
for the Southern District of Florida
_____
**(January 28, 2000)**

Before COX, Circuit Judge, KRAVITCH, Senior Circuit Judge, and PROPST[*],
Senior District Judge.

KRAVITCH, Senior Circuit Judge:

This appeal involves a statutory interpretation question of first impression: whether the definition of "counterfeited" provided in 18 U.S.C. § 513(a) incorporates or replaces the preexisting common law definition which requires a showing of similitude between the counterfeit and genuine obligations.  Also presented is the extent to which evidence, admitted for charges that were later dismissed, may "spill over" and prejudice the jury's consideration of the remaining counts.  Finally, this appeal considers allegations of juror misconduct, a disputed Allen charge, and challenges to the admission of evidence of extrinsic offenses.

## I.  BACKGROUND AND PROCEDURAL HISTORY

_____

[*]Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

Arnold Paul Prosperi practiced real estate law in Palm Beach, Florida. As an attorney, Prosperi represented Patrick Donovan, an Irish citizen, and managed various financial matters for him. From approximately 1979 until 1995, Prosperi handled all of Donovan's investments in the United States, both in real estate and securities, acting as attorney and trustee. During his winter visits to Florida, Donovan met with Prosperi and reviewed the status of his investments at these meetings. Prosperi conducted much of Donovan's business through the Amaretto Corporation ("Amaretto"), a company incorporated in the Netherlands Antilles. Amaretto was beneficially owned by Donovan and his family, but Prosperi was granted power of attorney with authority to conduct all the corporation's affairs on Donovan's behalf.

During this period, Prosperi orchestrated three major real estate transactions and one mortgage refinancing for Donovan. First, Prosperi arranged the purchase and subsequent sale of a golf course from Amaretto to the United States Department of Veterans Affairs for $3,050,000 ("the Holigolf transaction"). Second, Prosperi arranged the purchase, renovation, and sale of a residential property at 143 East Inlet Drive in Palm Beach, Florida ("the Inlet Drive transaction"). For this transaction only, Amaretto purchased 50% of the property and initially loaned Prosperi money to acquire the other 50%. Third, Prosperi

3

bought property at 109 Royal Palm Way and constructed a commercial bank building using another company beneficially owned by Donovan, Perth Holdings, Ltd. ("the Royal Palm transaction"). Prosperi also managed the building on Donovan's behalf. Finally, Prosperi arranged the mortgage refinancing on the Royal Palm property for an amount $1.6 million in excess of the remaining principal ("the Refinancing transaction").

According to the Government, Prosperi began to misappropriate funds from Donovan's proceeds in 1987 for his personal use, creating false account statements and other documents to hide his subterfuge. Prosperi allegedly diverted the entire $3 million proceeds of the Holigolf transaction for his personal use[1] while advising Donovan that these funds were invested in certificates of deposit ("CDs". To bolster the deception, Prosperi created documents purporting to be CDs issued by J.P. Morgan bank and Morgan Guaranty Trust together with supporting paperwork. Prosperi presented these documents to Donovan during their annual meetings and represented them as genuine investments. Prosperi then failed to report the misdirected funds on his federal income tax returns, omitting $905,616 from his 1989 return and $532,000 from his 1990 return. The Government also claims that

[1]The total proceeds of the sale were $3,050,000. Both parties agree that Prosperi retained $50,000 of that amount as remuneration for arranging the transaction.

4

Prosperi diverted rent revenue from the properties on Inlet Drive and Royal Palm Way, as well as proceeds from the Refinancing transaction, and created false account statements to shield these activities from Donovan.

Donovan did not suspect the embezzlement until he was contacted by a representative of the United States Internal Revenue Service investigating Amaretto's tax liability arising from the Holigolf transaction. Although Donovan initially denied any connection to the company,[2] he later acknowledged his interest and cooperated with the agent. During that time, Donovan provided the Government with the financial documents he received from Prosperi and taped most of his phone conversations with Prosperi in which Prosperi apologized for taking money from Donovan and promised to return the money with interest, as soon as he was able.

In September 1996, a grand jury in Florida returned an indictment against Prosperi charging him with two counts of mail fraud under 18 U.S.C. § 1341 (Counts I and II), three counts of possessing a counterfeited security under 18 U.S.C. § 513(a) (Counts III-V), eight counts of money laundering under 18 U.S.C.

---

[2]According to Prosperi, Donovan used Amaretto and Prosperi as part of a larger scheme to conceal his wealth from the Irish Government. Donovan later settled his tax liability with the Irish Government for $4 million but denied that Prosperi's actions on his behalf had any illicit purpose.

§§ 1956 and 1957 (Counts VI-XIII), and two counts of filing a false tax return under 26 U.S.C. § 7206(1) (Counts XIV and XV). The circumstances surrounding the Holigolf transaction proceeds comprised the basis of both the counterfeiting and tax counts. The mail fraud and money laundering counts were based primarily on Prosperi's alleged misappropriation of funds from the Inlet Drive transaction, the Royal Palm transaction, and the Refinancing transaction. In June, 1997, the indictment was superseded to revise the money laundering counts and to add a forfeiture count under 18 U.S.C. § 982 (Count XVI).

Prosperi filed four separate motions to dismiss Counts I and II, III-V, VI-IX, and X-XIII, respectively. The district court adopted the Report and Recommendation of the magistrate judge and denied all the motions to dismiss. The case then proceeded to a two-month long trial. At the close of the Government's evidence, Prosperi moved for a judgment of acquittal on the mail fraud and money laundering counts on the ground that the Government had failed to prove that the mailings charged in the indictment furthered the scheme to defraud. The district court granted the motion and acquitted Prosperi on counts I, II, and VI-XIII. The court then sent the remaining tax and counterfeiting counts (counts III-V and XIV-XV, respectively) to the jury.

6

The jury returned a guilty verdict on all counts. Prosperi sought a judgment of acquittal on the counterfeiting counts on the ground that the Government did not prove the J.P. Morgan CDs bore a sufficient resemblance to genuine CDs in order to qualify as "counterfeited" within the meaning of 18 U.S.C. § 513. The district court initially denied the motion, but on reconsideration and after oral argument, granted the motion and entered an order granting acquittal as to Counts III, IV, and V.[3] Prosperi appeals his remaining convictions on the two tax counts, arguing that he was prejudiced by spillover evidence introduced for the other counts, irregularities in the jury deliberations, and by the cumulative effect of prejudicial errors during the trial. The Government, on cross-appeal, challenges the district court's grant of acquittal on the counterfeiting counts.[4] For the reasons that follow, we affirm Prosperi's convictions on the tax counts, reverse the district court's grant of acquittal on the counterfeiting counts, and remand for resentencing.

## II. ANALYSIS

### A. Alleged Juror Misconduct

---

[3]Prosperi also moved for a new trial on all counts; the district court denied this motion initially and again after granting Prosperi's motion for acquittal.

[4]The Government does not appeal the district court's order granting acquittal on the money laundering and mail fraud counts.

On the second full day of deliberation, a dismissed alternate juror notified Prosperi's counsel that one of the sitting jurors, Marilyn Budd, had called her in tears because she was being pressured by other jurors to convict Prosperi. The alternate also related that another sitting juror, Morris Levy, had decided to convict on the first day of testimony and had arranged the election of a like-minded juror as foreperson. Counsel reported this to the court and requested a mistrial or an inquiry. The district judge denied the request but sent the jury a note reminding them not to discuss the case unless all twelve jurors were present. Later, defense counsel requested either a mistrial or full investigation after observing juror Levy in a heated discussion with juror Budd away from the other jurors. The district court ruled that Federal Rule of Evidence 606(b)[5] precluded him from inquiring into the jury deliberations. The next morning, the district court conducted a

[5]Federal Rule of Evidence 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

limited inquiry, at the request of the Government, to determine if the dismissed alternate had exerted an improper outside influence on Budd. The alternate juror reported that she had advised Budd to resist pressure to change her vote. The district court did not permit defense counsel to make additional inquiry of the alternate, again citing Rule 606(b).

Investigation of alleged juror misconduct is committed to the discretion of the district court and is reviewed only for an abuse of that discretion. See United States v. Harris, 908 F.2d 728, 733 (11th Cir. 1990). Prosperi argues that the district court misapprehended the scope of its discretion under Rule 606(b) in refusing to conduct an investigation, and that this was a *per se* abuse of discretion. We repeatedly have recognized the breadth of the district court's discretion under Rule 606(b), and a "failure to hold a hearing constitutes an abuse of discretion only when there is evidence that the jury was subjected to influence by outside sources." United States v. Watchmaker, 761 F.2d 1459, 1465 (11th Cir. 1985). In this case, the district court investigated the possibility of external influence by the excused alternate, but declined to investigate allegations of internal influence occurring during deliberations. Not only was this decision within its discretion, but a contrary decision may have invited reversible error. See United States v. Norton, 867 F.2d 1354, 1366 (11th Cir. 1989) (finding no abuse of discretion in district

9

court's declination to question juror regarding alleged duress during deliberations because the "alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict"). Even if the district court underestimated the scope of its discretion under Rule 606(b), the court's ultimate decision not to investigate allegations of misconduct that were entirely endemic to the deliberations was not an abuse of its discretion.

## B. The Contested <u>Allen</u> Charge

During its deliberations, the jury sent the judge a note "indicating a verdict on 3, 4 and 5[the counterfeiting counts]" but that "they are hung up on 14 and 15 [the tax counts] and . . . there is no change in the near future."[6] Over defense counsel's objection, the district judge declined to give a full <u>Allen</u> charge and instead instructed the jury to "please continue to deliberate on counts 14 and 15."[7] Prosperi argues this instruction constituted an abbreviated <u>Allen</u> charge that coerced the jury's ensuing guilty verdict on all counts. Prosperi relies exclusively on <u>United States v. Bass</u>, 490 F.2d 846, 854-55 (5th Cir. 1974), <u>overruled on other grounds by</u> <u>United States v. Lyons</u>, 731 F.2d 243, 246 (5th Cir. 1984), in which

---

[6]R34 at 4814-15.

[7]<u>Id.</u> at 4815.

10

our predecessor court reversed a conviction coerced by an improper <u>Allen</u> charge.[8] This reliance is misplaced. In <u>Bass</u> the jury asked whether it would be acceptable to return a mixed verdict of guilt on some counts and hung as to others, to which the district court responded with an instruction to continue to deliberate on those counts for which the jury were "not yet in unanimous agreement." <u>Id.</u> at 854. The <u>Bass</u> court found that, because this instruction bore all the coercive aspects of a typical <u>Allen</u> charge but none of its curative features, it may have caused the jury to believe that only guilty verdicts were acceptable. <u>See</u> <u>id.</u>

An <u>Allen</u> charge in the absence of a prior poll of the jury will warrant reversal only when "inherently coercive." <u>United States v. Trujillo</u>, 146 F.3d 838, 846 (11th Cir. 1998). The instruction given here, however, can not be properly considered an <u>Allen</u> charge. The judge's simple request that the jury continue deliberating, especially when unaware of the composition of the jury's nascent verdict, was routine and neutral. Nothing in the brief instruction suggested that a particular outcome was either desired or required and it was not "inherently coercive." <u>See</u> <u>Watchmaker</u>, 761 F.2d at 1465 (finding judge's entreaty to "go back in there and work with those other eleven people and try to render a verdict"

---

[8]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

was not coercive); see also Norton, 867 F.2d at 1366 (finding instruction encouraging continued deliberation did not "approximate an *Allen* charge or in any other way urge a verdict").[9]

## C.  The Counterfeiting Statute

The jury found Prosperi guilty of three counts of making, uttering, or possessing a counterfeited security with the intent to deceive another person, in violation of 18 U.S.C. § 513(a).[10]  The statute defines the term "counterfeited" as "a document that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety."  18 U.S.C. § 513(c)(1).  After the verdict was returned, Prosperi moved for acquittal on the counterfeiting counts because the Government had failed to establish the requisite similarity between the J.P. Morgan

---

[9]Prosperi also suggests that, in light of the irregularities in the jury proceedings, the subsequent charge would appear to the jury as an exhortation to convict. However, the "irregularities" cited by Prosperi, and discussed in the previous section, are not as irregular as he submits.  Any suggestion that the jury was made more vulnerable to coercion thereby is speculation unsupported by the record.

[10]18 U.S.C. § 513(a) provides:

Whoever makes, utters or possesses a counterfeited security of a State or a political subdivision thereof or of an organization, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than ten years, or both.

12

CDs and genuine CDs. The court initially denied the motion but, on reconsideration, granted the acquittal. On appeal, the Government argues the district court erred in interpreting § 513(a) to require a finding of similitude in contravention of the statute's plain definition of the term "counterfeited." We find the Government's argument persuasive.

A district court's interpretation of a statute is a question of law reviewed *de novo*. See Rodriguez v. Lamer, 60 F.3d 745, 747 (11th Cir. 1995). Interpretation of this particular aspect of the counterfeiting statute is a question of first impression,[11] but recourse to older counterfeiting statutes is instructive. Traditional counterfeiting statutes left their key term undefined. In determining whether a fraudulent $100 bill was counterfeited within the meaning of 18 U.S.C. § 264, the Court of Appeals for the Third Circuit applied the following test:

---

[11]Two courts have briefly addressed the meaning of "counterfeited" in § 513 in different contexts. In United States v. Pullman, 187 F.3d 816, 822 (8th Cir. 1999), cert. denied, – U.S.–, – S. Ct. – (U.S. Jan. 10, 2000) (No. 99-945), the Eighth Circuit observed, without discussion, that § 513 provided its own definition of "counterfeited." The question before the Pullman court, however, was whether § 513 applied to documents "made from scratch," thus its brief discussion of the statute does not illuminate the discussion here. In United States v. Davis, 888 F.2d 283, 285 (3d Cir. 1989), the Third Circuit concluded, without discussion, that because "washed" automobile certificates satisfied the "falsely made" requirement of 18 U.S.C. § 2314, they were also counterfeit within § 513's definition as "falsely made or manufactured in its entirety." See also United States v. Blakey, 960 F.2d 996, 999-1000 (11th Cir. 1992) (citing § 513's definition of "counterfeited").

> [W]hether the fraudulent obligation bears such a likeness or resemblance to any of the genuine obligations or securities issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest.

United States v. Lustig, 159 F.2d 798, 802 (3d Cir. 1947), rev'd on other grounds, 338 U.S. 74, 69 S. Ct. 1372 (1949).  This has become known as the similitude requirement and was adopted by virtually every court of appeals including this one.  See United States v. Wethington, 141 F.3d 284, 287 (6th Cir. 1998); United States v. Parr, 716 F.2d 796, 807 (11th Cir. 1983); United States v. Parnell, 581 F.2d 1374, 1381 (10th Cir. 1978); United States v. Anderson, 532 F.2d 1218, 1224 (9th Cir. 1976); United States v. Chodor, 479 F.2d 661, 664 (1st Cir. 1973); United States v. Smith, 318 F.2d 94, 95 (4th Cir. 1963).  The counterfeiting statutes, 18 U.S.C. §§ 472, 473, and 474, were then held to require a finding of similitude, with the understanding that the common law definition would apply.  See Wethington, 141 F.3d at 287 (§ 472); Chodor, 479 F.2d at 664 (§§ 472, 473, and 474); Smith, 318 F.2d at 95 (§ 472).

With the passage of § 513, Congress broke from the tradition established in §§ 472, 473, and 474 by incorporating its own definition of the term "counterfeited":  "a document that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety."  18 U.S.C. § 513(c)(1).  In spite

of this language, the district court accepted Prosperi's argument that § 513, like its counterfeiting predecessors, contained an implicit similitude requirement. Finding the government had not met its burden to prove similitude between the J.P. Morgan CDs and genuine CDs, the court granted Prosperi's motion for acquittal on the three counterfeiting counts. On appeal, the Government argues the district court misinterpreted the statute.[12]

In the case of currency or other generally recognizable documents, a similitude requirement developed both as a definition, allowing for juries to determine whether a counterfeit document copied its genuine analogue, and as evidence of the defendant's intent to defraud. See United States v. Hall, 801 F.2d 356, 358-59 (8th Cir. 1986). In cases involving less recognizable documents, however, the Government argues that greater protection for the unsuspecting individual is warranted.

Review of a statute begins with its language. See Landreth Timber Co. v. Landreth, 471 U.S. 681, 685, 105 S. Ct. 2297, 2301 (1985). If the meaning of the statutory language is plain, reference to legislative history is not necessary. See

_____

[12]Both the Government and Prosperi argue the other waived their respective similitude arguments by not raising them at trial, but the Government timely appealed the district court's grant of acquittal on Prosperi's counterfeiting counts. Review of this decision turns on the proper interpretation of 18 U.S.C. § 513, a question we review *de novo*.

15

United States v. Ron Pair Enter., Inc., 489 U.S. 235, 240-41, 109 S. Ct. 1026, 1030 (1989). By its plain language, § 513 defines the term "counterfeited" without reference to similitude. Legislative usurpation of existing common law definitions should not be presumed lightly. See Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S. Ct. 1011, 1014 (1952). But when Congress speaks clearly on an issue, and when the language chosen comports with the statutory purpose, the legislative definition supplants the preexisting common law definition. See id.; United States v. Texas, 507 U.S. 529, 533, 113 S. Ct. 1631, 1634 (1993).

In determining that a finding of similitude was required for Prosperi's conviction, the district court relied on one statement from the legislative history of § 513 stating that the statute's definition of counterfeited "carries forward the general view that, in order for an article to be counterfeit, it need only bear such likeness or resemblance to the genuine article as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest." Senate Report of the Committee on the Judiciary, Criminal Code Reform Act of 1981, No. 97-307, 97th Cong. § 1741 at 775-776. In light of the unambiguous language in the statute, reference to the legislative history was not necessary.

An interpretation of § 513 that does not incorporate a similitude requirement also is supported by the statute's stated purpose. The Government notes that § 513 was enacted to address the increasing production of counterfeited documents that are not as generally recognizable as currency, such as CDs. See S. Rep. No. 225, 98th Cong., 1st Sess. at 371, reprinted in 1984 U.S.S.C.A.N. 3182, 3512 ("Present Federal law is inadequate to combat widespread fraud schemes involving the use of counterfeit State and corporate securities."). With that goal in mind, Congress needed a broader definition of "counterfeited." If the average consumer does not know what a genuine CD looks like, she would not be protected fully by a statute criminalizing only those counterfeits that resemble genuine CDs.[13]

---

[13]In addition to arguing that § 513 does not require a finding of similitude, the Government rummages about the case law for decisions in which courts have not required similitude in other counterfeiting cases. The Government cites Hall, 801 F.2d at 358, for the proposition that similitude is only required in possession cases. In Hall, the Eighth Circuit held a finding of similitude was not required for a conviction of passing an altered obligation in violation of 18 U.S.C. § 472. See id. at 360. The court reasoned that the similitude requirement originated primarily as a definition of "counterfeited" and secondarily as evidence of intent to defraud, an element of all counterfeiting laws but especially significant in cases of possession only. See id. at 358-59. Because an intent to defraud could be inferred from the defendant's attempt to pass an altered $10 bill and because the currency involved was altered rather than counterfeited, the Hall court found a similitude requirement unnecessary for either of its two purposes. Id. at 360. The Hall decision does not inform the question before this court.

As another alternative, the Government cites United States v. Turner, 586 F.2d 395 (5th Cir. 1978), to argue the similitude requirement was satisfied here. In Turner,

17

Although § 513's definition of "counterfeited" is unique among counterfeiting statutes, § 2B5.1 of the United States Sentencing Guidelines defines "counterfeited" in precisely the same terms, see U.S. Sentencing Guidelines Manual § 2B5.1 applic. n.3 (1998), and courts interpreting the "purports to be genuine" language in § 2B5.1 have not required a finding of similitude. See United States v. Webster, 108 F.3d 1156, 1157 (9th Cir. 1997) (Section 2B5.1 does "not require counterfeit bills to be of 'passable' quality. They must 'purport' to be genuine but need not be mistakable as such."); see also United States v. Lamere, 980 F.2d 506, 513 (8th Cir. 1992) (U.S.S.G. § 2B5.1 does not "require that the counterfeit bill or bills in question be of passable quality").

Prosperi suggests that because J.P. Morgan does not issue CDs, the phony J.P. Morgan CDs could not purport to be genuine. Accepting this argument would license counterfeiters to create fictitious documents with impunity. Cf. United

---

our predecessor court held that crude, one-sided, monochromatic photocopies of dollar bills were counterfeit within the meaning of 18 U.S.C. § 474 even though they bore scant resemblance to genuine currency. See id. at 397-98. The court reasoned that the successful use of the phony bills to obtain change from machines "demonstrated their dangerousness." Id. at 398. The court's decision, however, turned on the fact that "the language of section 474 covering obligations 'made or executed, in whole or in part, after the similitude' of genuine obligations is amply broad to include the photocopies in this case." Id. (quoting 18 U.S.C. § 474) (emphasis added). Because we do not interpret § 513 to require a finding of similitude, these arguments do not affect our decision in any event.

18

States v. Schlei, 122 F.3d 944, 972-73 (11th Cir. 1997) (holding that counterfeit, forged, and nonexistent securities were included within the definition of "security" for purposes of securities fraud charge because to hold otherwise would only encourage fraud), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523 (1998).  Prosperi also argues that, without hearing evidence on the characteristics of a genuine CD, the jury would have been unable to determine whether the CDs "purported to be genuine."  Prosperi notes the false J.P. Morgan CDs here were very crude and lacked many crucial features of genuine CDs, most significantly a drawer's signature.  However, similarity to genuine CDs, to the extent that could have been elucidated given their inherent variety, is only one factor to consider in determining whether a security "purports to be genuine."

Using the evidence presented in this case as an example, the jury could have found the fraudulent CDs "purported to be genuine" because they were accompanied by supporting documentation, were represented as such by an attorney and trustee, and were, in fact, accepted as genuine by the intended victim.  Thus, although similitude to a genuine analogue may help establish that a bogus security "purports to be genuine," a particular showing of such is not necessary to sustain a conviction under § 513.  In any event, the Government did elicit testimony from Sharon Adams, a manager for a subsidiary of J.P. Morgan, that the

19

counterfeited J.P. Morgan and Morgan Guaranty Trust Company CDs exhibited many official-looking features, such as the Morgan name, an account number, opening and maturity dates, initial principal amount, stated interest rate, and a warning of the penalty for early withdrawal of the deposited funds.[14] The jury could have found these features were included in the counterfeited CDs to increase the likelihood they would be accepted as genuine, and that is the standard required by § 513. The district court erred in interpreting 18 U.S.C. § 513 to require a similitude requirement.[15] The court's order of acquittal will be reversed and Prosperi's convictions for making, uttering, or possessing a counterfeit security in violation of 18 U.S.C. § 513(a) will be reinstated.

## D. Prejudicial Spillover

Prosperi argues his convictions on the tax counts were impermissibly tainted by the substantial evidence admitted on the mail fraud and money laundering counts that were dismissed before submission to the jury. The Government acknowledges that the counterfeiting and tax counts were both predicated on the Holigolf transaction, but argues that nonetheless the evidence regarding the other

---

[14]R15 at 1098-1100.

[15]Because we interpret § 513 as not requiring counterfeits to bear a similitude to genuine securities, we do not express an opinion on the validity of Prosperi's counterfeiting convictions had we interpreted § 513 differently.

20

transactions would have been admitted under Federal Rule of Evidence 404(b)[16] as evidence of Prosperi's intent to deceive Donovan on the counterfeiting counts.[17] Prosperi counters that if the evidence could have been admitted under 404(b), the judge would have had to have given a limiting instruction to the jury, which he did not do.

Dismissal of some counts charged in the indictment does not automatically warrant reversal of convictions reached on remaining counts. See United States v. Pelullo, 14 F.3d 881, 897 (3d Cir. 1994); United States v. Friedman, 854 F.2d 535, 581 (2d Cir. 1988). Rather, a reviewing court must consider whether the convictions were the result of prejudicial spillover: that is, was there evidence (1)

---

[16]Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[17]The Government also proffers an argument that the evidence would have been admissible to impeach Prosperi, even though all the spillover evidence was admitted in the Government's case-in-chief. We need not address the merits of this argument, however, in the wake of our conclusion that the spillover evidence would have been admitted under Rule 404(b).

21

that would not have been admitted but for the dismissed charges and (2) that was improperly relied on by the jury in their consideration of the remaining charges. See United States v. Rooney, 37 F.3d 847, 856 (2d Cir. 1994).

Because we have reinstated Prosperi's counterfeiting convictions, the first step in our inquiry will focus on whether potentially prejudicial evidence was admitted that would not otherwise have been admitted for either the counterfeiting or the tax counts. Prosperi contends that all the evidence regarding the Inlet Drive, Royal Palm, and Refinancing transactions was admitted to establish Prosperi's scheme to defraud Donovan, a necessary predicate to a mail fraud conviction. According to Prosperi, after the mail fraud-related counts were dismissed, there was no longer a proper basis for admitting evidence of these transactions. The Government persuasively argues, however, that evidence of these other transactions would have been admitted properly under Federal Rule of Evidence 404(b), either as inextricably intertwined with the counterfeiting counts or as evidence of Prosperi's intent to deceive Donovan. Because Prosperi's creation of counterfeited CDs was only part of an ongoing plan to deceive Donovan and plunder his assets, evidence of Prosperi's other deceptions was inextricably intertwined with the evidence supporting the counterfeiting counts. See United States v. Lehder-Rivas, 955 F.2d 1510, 1515-16 (11th Cir.1992) ("Evidence of

22

criminal activity other than the charged offense is admissible for purposes of Rule 404(b) if it: 'pertain[s] to the chain of events explaining the context, motive and set-up of the crime [and is] linked in time and circumstances with the charged crime, or forms an integral and natural part of the crime, or is necessary to complete the story of the crime for the jury.'") (quoting United States v. Van Dorn, 925 F.2d 1331, 1338 (11th Cir. 1991)).

In the alternative, the evidence of the other transactions could have been admitted under Federal Rule of Evidence 404(b) to establish Prosperi's intent to deceive Donovan with respect to the counterfeiting counts. Prosperi argues the Government had substantial evidence of Prosperi's intent to deceive Donovan from the circumstances surrounding the relevant Holigolf transaction, and that duplicative evidence would have been excluded by the district court under Federal Rule of Evidence 403.[18] Exclusion of evidence under Rule 403 is within the discretion of the district court, see United States v. Cross, 928 F.2d 1030, 1048 (11th Cir. 1991), and this court will not speculate on what the district court would have done had a Rule 403 objection been raised.

_____

[18]Federal Rule of Evidence 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

23

Even had the contested evidence not been admitted under Rule 404(b),

Prosperi's claim would fail on the second step of our inquiry, as there is

insufficient indication in the record that Prosperi's convictions on the tax counts

were prejudicially influenced by evidence of the other transactions. In evaluating

claims of prejudicial spillover, we consider several factors that would indicate

whether prejudice tainted the jury's verdict. First, we consider whether the jury

meticulously sifted the evidence admitted for all counts. See United States v.

Miranda, 197 F.3d 1357, 1359 (11th Cir. 1999) (per curiam); United States v.

Stefan, 784 F.2d 1093, 1101 (11th Cir. 1986). Relevant to this inquiry is the

similarity of the evidence introduced for the separate counts: distinct evidence is

less likely to result in prejudicial spillover. See Pelullo, 14 F.3d at 898. A

discriminating acquittal also can signal that the jury was able to sift through the

evidence properly. See United States v. Eason, 920 F.2d 731, 737 (11th Cir.

1990); see also Pelullo, 14 F.3d at 899. Second, we examine whether the contested

evidence was inflammatory in nature, and thus liable to prejudice the jury. See

Rooney, 37 F.3d at 855. Third, we consider whether admission of the other

evidence significantly altered the defendant's trial strategy. See United States v.

Ivic, 700 F.2d 51, 65 (2d Cir. 1983). Finally, we assess the strength of the

24

evidence against the defendant on the remaining counts. See Rooney, 37 F.3d at 856.

Application of these factors to the evidence in this case suggests that no unfair prejudice resulted. The jury convicted Prosperi on all five counts under its consideration, and the evidence supporting the tax counts resembled that supporting the other counts, involving as they both did embezzlement from Donovan. The jury was able to sift through the evidence presented, however, as evidenced by its delay in reaching a unanimous verdict on the tax counts after finding Prosperi guilty of the counterfeiting counts.[19] In addition, the evidence of Prosperi's other misdeeds, all of the "white collar" variety, is not the type that would ordinarily inflame or prejudice a jury. Indeed, the jury's hesitation and continued deliberation on the tax counts after reaching a verdict on the counterfeiting counts strongly suggests the jury was not inflamed or prejudiced by

---

[19]Prosperi finds evidence the jury was incapable of sifting through the evidence in its request for evidence Prosperi contends did not pertain to the remaining counts. During deliberations, the jury requested the transcript pages concerning purported loan checks from Perth Holdings, Ltd. to Amaretto. Prosperi's counsel objected on relevancy grounds. The court, finding the evidence relevant to Prosperi's intent to defraud Donovan with regard to the counterfeit securities, overruled the objection. Because the jury announced its uncertainty on the tax counts after requesting and receiving this evidence, there is no indication the jury was unable to properly sift through the evidence. Furthermore, this note was only one of many sent by the jury, the number and substance of which exhibit the jury's careful consideration of the evidence.

the spillover evidence. And other than a bare assertion that he might not have testified, Prosperi presents no reasonable explanation that his trial strategy was altered by the admission of the other evidence. Finally, notwithstanding the jury's initial hesitation in delivering a guilty verdict, our review of the record shows the evidence supporting the tax counts was substantial.

Prosperi emphasizes the fact that the district court did not strike any of the evidence or provide a limiting instruction. Limiting instructions by the court to the jury may provide further assurance that the jury did not consider improper evidence. Cf. United States v. Adkinson, 135 F.3d 1363, 1373 (11th Cir. 1998) (expressing concern that "the government's evidence remained in; none was stricken. There was no instruction to the jury to disregard any of it. If this strategy is sanctioned, the rules of evidence provide little protection against conviction by inadmissible evidence.") (footnote omitted). Here, in light of the district court's decision that the evidence of the Inlet Drive, Royal Palm, and Refinancing transactions was admissible to establish Prosperi's intent to deceive Donovan, the court's failure to provide a specific limiting instruction is hardly remarkable.

Although Prosperi challenges the sufficiency of the district court's instructions, he neither submitted proposed jury instructions nor objected to the instructions delivered. In addition, the district court did instruct the jury that:

A separate crime or offense is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty as to one of the offenses charged should not affect your verdict as to any other offense charged.[20]

Only after the jury had been deliberating for several hours did defense counsel request a further instruction to the jury "that they are not to consider evidence that doesn't pertain to the remaining charges" because of concern the jury "may well be considering a lot of evidence which is no longer part of the case."[21] The Government objected on the ground that all the evidence admitted was relevant to Prosperi's intent to deceive Donovan under the counterfeiting counts. The court declined to instruct the jury further, reasoning:

The evidence that came in related to pending charges at the time, so there was certainly no error in allowing the evidence to come in at the time.

The jury was instructed that they only had the two charges, that is, the tax charges and the counterfeit security charges, so I think they understand that clearly.

Furthermore, by the closing argument of counsel, they directed the jury to what were the only remaining issues, and I think they clearly understood closing argument of counsel in that regard.

The indictment still does charge the defendant with defrauding Mr. Donovan, and of course, it's confined to the counterfeit securities, but

---

[20]Id. at 4787.

[21]R33 at 4794.

27

the other actions with regard to the financial statements – not financial statements, bank statements, was really not argued to the jury because it would be outside the scope of the indictment.

Conceivably it could be to show intent to defraud in regard to other matters. They understand that this issue is no longer before them. I think the jury understands its function and its duty and it would be very difficult at this point to go through and remove exhibits from the jury or to give them further instructions at this point. I think they have had all the proper instructions, so I will deny the defendant's motion.[22]

The evidence of the Inlet Drive, Royal Palm, and Refinancing transactions would have been properly admitted as either inextricably intertwined with the counterfeiting counts or as evidence to establish Prosperi's intent to deceive Donovan with respect to the counterfeiting counts. Moreover, the record shows that there was sufficient evidence, excluding the spillover evidence, to support Prosperi's convictions on the tax counts and that the jury's verdict was not the result of unfair prejudice. Accordingly, we affirm Prosperi's convictions on Counts XIV and XV.

### E. Extrinsic Acts Evidence

Prosperi argues that evidence of his failure to file other tax returns, omissions not pleaded in the indictment, contravened Federal Rule of Evidence 404(b). At trial, IRS Special Agent Jaque Nichols testified that Prosperi did not

---

[22]Id. at 4796-97.

file a  trust return for the Royal Palm property in 1988 or 1989 or a corporate return for Amaretto in 1989.[23]  Defense counsel's objections to this testimony on Rule 404(b) grounds were denied.  Evidence of extrinsic offenses properly may be admitted if relevant to an issue other than the defendant's character and if its probative value is not substantially outweighed by the danger of unfair prejudice.  See United States v. Veltmann, 6 F.3d 1483, 1499 (11th Cir. 1993).  A district court's decision to admit such evidence will not be reversed absent a clear abuse of discretion.  See United States v. Edwards, 696 F.2d 1277, 1280 (11th Cir. 1983).[24]  Here, the district court found the evidence was not admitted to impermissibly establish propensity, but rather to prove Prosperi's criminal intent as manifested by his misrepresentations to a bank and Amaretto's tax attorney that the tax returns had been filed.[25]  We cannot say this determination was a clear abuse of discretion.

## III.  CONCLUSION

---

[23]R20 at 2018-29.

[24]Prosperi also argues the Government conceded this issue by failing to address it in its brief.  Even if the Government waived its right to argue the propriety of the extrinsic acts evidence, we would not reverse on this ground without independent consideration.

[25]See R20 at 2020-22; id. at 2025-27.

For the foregoing reasons, we REVERSE the district court's order of acquittal on Counts III-V, AFFIRM Prosperi's conviction on Counts XIV and XV and REMAND for resentencing in accordance with this opinion.